Good morning. It's our pleasure to welcome Judge James Robertson from the United States District Court of the District of Columbia, sitting with us by designation of the Chief Justice, and we appreciate his assistance. The first case this morning, Aventis Pharma v. Lupin, 06-1530-1555. Good morning, Your Honor. May it please the Court. The bulk of the District Court's fact findings below were correct, and Lupin does not challenge them on appeal, but there were critical junctures in the District Court's legal analysis where it went astray, and I wish to address three errors in particular this morning. First, the District Court wrongly presumed that the sharing prior art had to say should separate isomers rather than can separate or may isolate isomers in order for Lupin to prove invalidity by clear and convincing evidence. Second, the District Court ignored this Court's all-elements rule in the context of its equivalence analysis. Rather than analyze whether Lupin's deliberate addition of other isomers to its product was the equivalent of a claim that required them to be removed, the District Court's analysis turned on whether Lupin's ANDA product was therapeutically equivalent to a commercial embodiment, and that was error. Here, the case is procedurally positioned so that the Court can enter summary judgment of non-infringement in favor of Lupin. Lupin's summary judgment motion below presented unrebutted expert testimony that the amount of other isomers in Lupin's product were large and substantial. Lupin also presented unrebutted test data in the form of TLC testing that demonstrated that the amount of other isomers in its product could be tested and detected by the very test that Aventis had relied on before the PTO to support its substantial and clear of other isomers claim element to satisfy the written description requirement. Third, the 722 patent violates 35 U.S.C. Section 110. The District Court found that the specification never defines the phrase substantially free of other isomers, never describes what substantially free of other isomers is, and the specification never even characterizes as the invention that Ramaprel and substantially free of other isomers is what the inventors meant to claim. Since substantially free of other isomers is the only claim element that has been alleged to differentiate the 722 patent claims from the sharing of prior art, those deficiencies in the specification are fatal under this Court's case law such as Seattle Boxing Industrial Crating, Honeywell v. ITC, and Purdue Pharma v. Falling. If I may, I'd like to start with the obviousness analysis because here the District Court clearly found it to be critical that the sharing of prior art only taught the person with ordinary skill in the art, that the disclosed Ramaprel isomers could be isolated or should be separated, I'm sorry, or may be separated as opposed to should be separated, but that was error and that error is readily correctable here. In Ray Adamson, 275 F. Second, 952 CCPA 1960, never required so stringent a standard as should be separated. In Adamson, the pending claims were directed to an isomer that was isolated from its companion isomer. The analysis that the Court followed there was first, would the person skilled in the art understand... Let me just ask you, I don't know if you're going to get there or not, but do you think that KSR, Springfield's case, will actually outcome out of this? Well, I think that what KSR instructs and I think that what the KSR case tells us is that you shouldn't have an extremely rigid test for demonstrating obviousness and here I think that trying to draw a distinction between should separate versus can be isolated or may be separated, that that's really too stringent of a test. I think that what the Supreme Court made clear in KSR is that the person, is that the critical part of the analysis is, is there something that would prompt the person of ordinary skill in the art to arrive at the claimed invention. Here, when the very prior reference discloses this all-S Ramacron isomer and tells you, not once but twice, within the specification, that the S isomers and these other isomers should be separated or could be separated from one another or may be isolated from one another, and when you look at the actual specification itself, and everywhere in the specification it's talking about preferences for the S isomer, when you take that and then you couple it with the district court's other fact findings that found, for example, that the column chromatography separation technique, that the one that is disclosed in the sharing prior art reference is the same one that was used in the 722 patent, that this is something that persons of ordinary skill in the art know how to use to separate isomers, that it's considered to be a routine technique that can be used to separate isomers. When the district court also finds that the level of ordinary skill in the art is high, you know, that in and of itself directs the, you know, should read this as obvious, particularly when the district court found that there were no secondary considerations that were demonstrated non-obviousness. The district court here, it seemed to me, placed a great deal of emphasis on motivation or lack thereof. And in that sense, perhaps KSR does change the landscape a little. Right. Well, I think even under, you know, even in the pre-KSR landscape, you know, the test of this court was never a motivation that was, you know, you must be able to get this product, or there must be an explicit instruction that you will go get this product. Here the court's precedent has been that there needs to be some reason, some suggestion or motivation to provide. And here, the sharing of prior art references by saying these isomers can be isolated and may be separated, that's all the suggestion that you should need. And that's why, you know, when it gets to the Adamson case that came up in the 1960s, that relied on a reference that was back in 1949 that said the person of ordinary skill in the art in this field is going to understand, once they are aware that the race may exist, that separation of these isomers is potentially possible. Now, as I understand it, the prosecution in this case was rather lengthy, and at one point the claims were amended and this limitation was removed, focusing on the substantially free of other isomers, and that seemingly did the trick of convincing the examiner to allow this. But what was it about the period that rendered these claims patentable? Normally, if the prior art shows a compound, even a compound mixed with other compounds, simply a claim to this compound in a more pure form doesn't necessarily result in patentability in absence of some showing of, for example, unexpected results. I completely agree with that. And what was the cure in this case that convinced the examiner to allow it? That might be a question left to my opposing colleagues. To me, I don't think the PTO had a good reason. Aside from perhaps sheer exhaustion after seven years of interference. But the claims... It does happen. It does. And I think here, what happened is, we had three different examiners over the course of seven years, and originally, the first part of the prosecution was all spent trying to differentiate... I'm sorry, not differentiate, but trying to antidate the sharing references. They tried to come up with all sorts of reasons why the sharing references wouldn't get the version of ordinary scale in the art from Randall Krill, and those were rejected time and time again by the PTO examiner. The examiner declared an interference. They go into the interference. Sharing essentially takes the compound claims, winds up getting the 258 patent, which included a claim to the 5S isomer. And Aventis, to try to get something out of the PTO, tried to come up with this distinction that substantially free of under isomers somehow represents an advancement over the art. Now, that raises to us some of the 112 issues, which is that if you're going to say that substantially free of under isomers now is your invention, where is that in the specification? And that's one of the first rejections that the PTO examiner issued when those claims came back before her. She issued a section 112 written description rejection. She said, look, your patent examples don't say anything about... the purity of the working examples. It was undisputed in trial that substantially free of other isomers is nowhere described in the specification. So if substantially free of other isomers is supposedly adding something here that's inventive, what problem was it trying to solve? What have you given the public in exchange for substantially free of other isomers? As I understand it, the district court found no unexpected results. That's correct. No, we completely agree that there weren't any unexpected results here. When Aventis was before the PTO, they submitted a declaration by a gentleman named Mr. Becker. And what Mr. Becker told the PTO is, I've made a mixture of isomers where the amount of Ramacryl in there is about 35%. I've got some pure Ramacryl, a 5S isomer that's there at about 100%. And look, it turns out that this 100% Ramacryl is three times more potent than the mixture. And the district court said, well, that's really not saying all that much. What you've basically done is you've cut the dosage by a third and you've got one third of the potency. How is that unexpected? So I think that that was given to the PTO. And the PTO did very well to rely on that to avoid the obviousness rejection. But when the district court actually delved into the actual data and heard the evidence in trial, he was not convinced that there were any unexpected results at all. And since he made a specific finding to that effect, he felt there was no commercial success that could be associated with this. You know, if there was ever an isomer case that was designed to be found obvious, I think that this is the one. So I think that- I'll give you your rebuttal pen. Go ahead. No, that's it. You want to sign your rebuttal pen? Yes, thank you. Well, I'll see you now. We're going to go back to the argument. Where is it? Yes, good morning, Your Honor. Mr. Cerullo? Yes, Your Honor. Eric Cerullo from Jones Day on behalf of King Pharmaceuticals. In light of the arguments we heard this morning, we were trying to debate how much time to save for each argument. I'm going to seek my time with Mr. Katkoff, and I would like to reserve one minute, if I may, on the cost appeal. Thank you, Your Honor. I'm Bill Katkoff. I'll address the audience in this question we just spoke about. And the first thing I'd like to address is Judge Lynn's question about what's the advantage of the single isomer, substantially free of other isomers, as opposed to a mixture. And the record shows, Your Honor, that Ramipro, that is a 5S isomer, substantially free of other isomers, is 18 times as potent as the next most potent isomer, which means that when Ramipro is mixed with any other isomers, you have something which is less potent than Ramipro, substantially free of other isomers. And that was a finding of the district court, actually, in 18 times as potent. But that did not lead the district court to find that there was any unexpected results. Well, the district court, Your Honor, I'd like to direct your attention to page 877-78, page 7677 of the district court's opinion, where the court said, the court agrees with the Ventus claim that the evidence shows that as of 1981, there was no expectation that Ramipro isomers would be more or less potent than a mixture. No expectation would be more or less potent than a mixture. How could it be less potent? It would be less potent than the mixture if some other isomer was more potent than Ramipro. So if you mix Ramipro with something which is more potent, then that mixture would be more potent than Ramipro itself. As of the time of the invention, no one knew which was the most potent isomer. It wasn't known. And since it wasn't known what's the most potent isomer, it could not be predicted whether Ramipro, substantially free of other isomers, would be more or less potent than the mixture. That's what the court found. At appendix page 81, the court says, finally, the court is not persuaded that the evidence shows that Naloxone indicates unexpected results. Yes. And then the court goes on to discuss whether it's superior to a Naloxone, which was another prior on compound, as opposed to whether it was more or less potent than the mixture. So the court did find that it was not convinced that there was unexpected results on the superiority with respect to a Naloxone. But with respect to the superiority over the mixture, the court did find that there was no expectation, as of the time of the invention, that Ramipro, substantially free of other isomers, would be more or less potent than the mixture. And that's important. And your honors, for Ramipro, substantially free of other isomers, to be obvious over the prior art mixture, I submit you need three things. First, you need, under the law, you need a reasonable expectation of success that you're going to be able to separate the single isomer from the mixture. Second, even if you have that reasonable expectation of success, that you're going to be able to separate out the isomers, you need a reason to go for a single isomer, as opposed to just staying with the mixture and using that. And finally, It's common sense, is it not, that if you find a compound that has some advantageous effectiveness for medicinal purposes, that you're always trying to find a more pure form that's just logical. That drug is effective in some form, that if it can be made in a more pure form, one would normally expect that it would be more effective. Well, your honor, many drugs have different isomers that are equally effective and are sold, in fact, as mixtures of isomers. They're called racemic mixtures, mixtures of two isomers. Ritalin was one which was mentioned during the trial in the district court. Ritalin is sold as a racemic mixture, two different isomers. Subsequently, it was discovered that a particular isomer was more potent, and now that has been developed as a commercial product. The fact that you have, theoretically, you can go search for a particular isomer and get something better, doesn't mean that that's obvious, but you have a mixture that works and you're comfortable with that. And in this case, your honor, we're very lucky. Well, we're doing this in the context of the KSR case, trying to make, give good content to it. Yes. It sounds to me like this is exactly the kind of case they were suggesting. Well, the principle of KSR was you don't look at rigid rules, you look to common sense predictability, common sense notions of predictability. And here, we are very lucky because the district court did just that, even before KSR. It applied common sense notions of predictability, and what we have here is we have the sharing scientists who were people who were actually in the labs at the time, people working in the trenches. To whom, this was not obvious. And if I could take the court through that very quickly, first of all, with regard to reasonable expectation of success. You know, counsel says, well, it was a matter of routine, you could separate the isomers, anyone could do it at the time. The evidence in the trial court was different, and the district court's fact finding was different. The evidence in the trial court was, sharing Dr. Neustadt, who's a third party, no accident rhyme in this case, the author of the prior art, he was asked whether a person of ordinary skill in the art would have been able to separate that 31925 mixture that he had made into the component isomeric species. He answered, not easy to predict. And then he was asked the same question about that example 20 in the sharing reference. He said the same thing. The ability to separate different materials is not readily predicted. There might or might not be an efficient separation achievable. And in fact, another sharing scientist, Dr. Smith, testified that the same procedure, which worked for one compound, was applied to another compound. It didn't work. It did not separate the isomers. And again, Dr. Keats, inventor on the 722 patent, he testified to the same effect. It wasn't always possible to separate the isomers. So the evidence was there was no reasonable expectation of success. I'm sorry? I'm not sure that really matters. I think it's always possible. It is not always possible. Right. The evidence was it's not always possible. Right. And whether they did not have that expectation that they would be able to do it. So that's real world evidence that there was no reasonable expectation of success. And Judge Lynn, you noted that the district court relied heavily on motivation. Now, KSR, of course, said you still need some reason that a person still in the art would go ahead and make the composition in question. I'll shy away from the word motivation, but you still need that reason in the prior art. And again, here we have real world evidence. But I have to take the district court from the record. And I thought the district court opinion was very thorough, very comprehensive, and showed quite a skillful understanding and mastery of the complex issues involved in this case, but seemed to place a great deal of emphasis on motivation. Motivation in the, shall we say, pre-KSR sense. And I think what the Supreme Court indicated in KSR is that liquidity in the application of that is not required and that some reasoning needs to be shown, some reason to do it. But as I said earlier, it seems to me it's quite logical to find that just the desire to have a more pure form of a drug is reason enough. Your Honor, it's easy to apply hindsight to something that happened 25 years ago, but people who were actually there at the time, for example, sharing scientists who testified in this case, they were asked, well, why didn't you separate the isomers? You should say now, well, in hindsight, you separate the isomers. And the answer was there was not sufficient interest in pure isomer per se, A3146. Not interested. Why not? Why weren't they interested? Because they had a mixture that worked. They said that the pharmacological testing, it worked. That's a compound, a mixture. It's a different isomer. So we're not talking about purity in terms of getting rid of dirt. We're talking about a mixture of drug compounds, different isomers, but still a mixture that worked. And as the district court found, there's no reason to expect that a single isomer would be better. So why go for the particular isomer? That's the real-world evidence at the time was they were not interested in the pure isomer per se, as the scientists, again, a third party in the Lexton-Brunden case, author of the prior art, was not interested. So there was no motivation. What does that have to do with other options? Well, that has to do with whether a person skilled in the art would have a reason to make the particular compound. They weren't interested in that, so they weren't doing it. Oh, I see what your honor is asking. This was a team of scientists who were working. The testimony was it was their sole and only interest for two years to come up with an ascent header that works. So they weren't interested in separating this particular isomer because they found something that worked. There was no reason to go ahead and separate it. They were not interested in the pure isomer. And beyond that, even if you were interested in a single isomer, there was no reason to go for the 5-5-5-5-5 isomer, the all-s isomer, particularly the 5-5 across the bridge at Carbis, as the district court found. But there was some indication that all-s isomers were known to be more effective in a prior art. Not necessarily the 5-s isomer, but there was some indication that all-s isomers were more effective, correct? Your honor, that pertains to Carbis, the chiral centers, not at the bridgehead, but rather at the ground shape. So there was the... We're talking now in terms of obviousness and whether there's some reason... But you would need some reason. If you have s's at one end of the molecule, you have some reason why you would also expect that you would want to have s's at the other end of the molecule at the bridgehead, Carbis. And there was no evidence that the information that you had about cactochrome and enalochrome, which had to do with the other end of the molecule, tells you what you should have at the bridgehead. And your honor, at this point actually, the testimony in the district court was unanimous. Experts from both sides, and the Sherry inventors, and the Ventus inventors, everyone agreed that there was nothing in the prior art that tells you what should be at the bridgehead, that the bridgehead should be s-s. And it's somewhat oversimplifying to say all-s, because that's pertaining to parts of the molecule which are not really an issue here. The part of the molecule which is an issue here is across the bridgehead, where there was nothing in the prior art that would tell a person still in the art that when it came to the 5-5, those two five-membered rings that are fused together, when you have a bridgehead which connects those two carbon rings, that you should have s-s across the bridgehead. The only thing which Lupin relies on for the bridgehead carbons was a disclosure in the Sherry references where there was a 6-5 ring system. That means a six-membered ring attached to a five-membered ring. It's a different molecule where there was a molecule disclosed in the Sherry references which had an s-s there. But the evidence at trial was that the only reason there was an s-s there is that was a consequence of the particular synthetic process for making that and that the process which was used for making the five carbon rings was a different process which would not result in the s-s. There was no data in the Sherry references which would tell you if you put s-s there, you'd get something better. So again, there was nothing in the prior art suggesting s-s at the bridgehead as being in any way superior or the way you'd go. So again, just to tick it off very quickly, number one, the issue of ease of separation or difficulty of separation, no reasonable expectations of s-s. Okay, unless the court has any questions, then I'll conclude. Thank you. Thank you, Your Honor. Please support. Just to speak briefly on a cross-field issue, which is the issue of wolfhound infringement in a Paragraph 4 Hatch-Waxman case. The district court here dismissed as a matter of law that a claim for wolfhound infringement may not be based solely on the filing of a baseless A&B application. The court made that ruling based on two decisions. The omnibene chief decision of this court and Glaxer from this court. I think once you look at both those decisions, you will clearly see that neither decision has forbade the possibility of a baseless Paragraph 4 being the basis of a charge of wolfhound infringement in a Hatch-Waxman case. For example, not mutually, the court simply found that the trial court below did not need to reach the issue of whether or not the A&EA certification, the Baseless Certification Act, is needed to be elevated to a fine of wolfhound infringement. It certainly did not say that it was prohibited. Even in Glaxer, and Glaxer suffers from a couple additional problems. One being, of course, that it was not a Paragraph 4 case. It was an antibiotic case and there was no certification in that case. There again, the court never said that based on a baseless Paragraph 4 certification, there cannot be a charge of wolfhound infringement. You're arguing wolfhoundness to support an exceptional case determination under Section 285, not an enhancement of damage you support under 284, because damages are not appropriate in this context. Your Honor, yes, there's been no commercial wants without a consequence. The enhancement of damages via paternity leave, which would be the remedy here, is certainly an option. The finding of wolfhound infringement could enhance those damages clearly. But to say from the get-go that wolfhoundness as a claim in a natural action case, when a baseless Paragraph 4 exists as a matter of law, it does not exist, has not been stated by this court yet. I believe there's at least a couple of cases on the other side of it at the district court level since Glaxo, some on the side of Glaxo. If you look at the reasoning behind the court's conclusions in those cases, it doesn't necessarily conform with, it doesn't address them, so I'm not going to conform. It doesn't address the common sense and common sense actions here and the intent of patchwork action. Ultimately, Dominucci did recognize there's a duty of care when you file a Paragraph 4 certification, and that duty of care needs to be taken. If you allow Paragraph 4 filings, you simply say- I think that's just what we should answer. Thank you, Your Honor. Thank you, Your Honor. First, an issue of potency differences, again, back in the Anderson case, it was recognized that those of us who are in the art group expect to see potency differences. The fact that Ramachal experienced some here is not something that renders it non-obvious. Second, under KSR, the facts are all here that the court needs in order to be able to find this pattern obvious. Common sense shows that the person of ordinary skill in the art would expect that there's going to be potency differences, and the 5S isomer of Ramachal is the one that was the most potent. That's not a surprise. Mixing in some other isomers doesn't change the potency of Ramachal. There have been some cases at the district court level where, for example, adding another isomer has caused either a potentiation of one of the isomers, or it's caused a reduction in the effect. That hasn't happened here. Ramachal works just as well whether it's got other isomers or whether it stays as long as the district court found. That's not been shown to be clearly or obvious. KSR, of course, dealt with the combination pattern in a predictable or mechanical area. We're not in a predictable art, are we? Well, I think that we are. We're in the art of ACE inhibitors. ACE inhibitors, the structures of the molecule were based on this Brazilian snake venom structure. It was an all-S isomer because it was a naturally occurring compound. It was a single isomer. That's how the art developed. This was structure-based drug design. Captopril, which was the first molecule, modeled on that snake venom, all-S isomer, and Nalopril, same thing, all-S isomer, marketed as a single isomer product. Merck informed the art that when you changed one of these S isomers to an R isomer, you could experience a 700-fold potency difference. The fact that they found an 18-fold potency difference is well within the optimization range that the person of ordinary skill in the art could expect. When you get to the sharing reference itself, it specifically teaches in the specification that when it comes to these amino acid part substructures, the preference is for the S isomer. Why? Because that's what mimics the naturally occurring compound. The ring system, that's an issue here. It's based on a proline ring. Proline is a naturally occurring amino acid. It's in the S configuration. Even when it comes to the other examples that Sharon put in their patent application, you've got this 5-6 ring that my colleagues disparaged, but a 5-6 ring structurally is going to do a ring system where one ring will be up like this, the other ring will be up like this. You've got the 5-5 ring system. Why would the person of ordinary skill in the art want to change the isomer configuration so that it flips down in the opposite direction? They're not going to do that. They're going to stick with the guidepost that Sharon has, that those of skill in the art had, which is all the time going towards the S isomer. More importantly, there's no teaching that says you should go in the opposite direction. We don't have a situation here where there's teaching away from the ultimate preferred isomer. Again, when it comes to the predictability of this art, I think that both your honors were on the Apotex B concept, Pfizer B, Apotex A, molybdenum decision. Mere fact that you might have to do some testing here or there that's routine to figure out which of these isomers is going to be the most potent isomer, that doesn't show that you've selected something or that you've done something that's non-obvious. And on the issue of isomer separation, again, I think that the most telling evidence is that when you look at the 7-2-2 patterns, you don't see anything in there that says isomer separation is hard. Here's a problem that we've solved in the art. They said use column chromatography, which is the same technique that Sharon used. It's the same technique that Merck used, that Squibb used to make the Captopril. And if you look at all the third-generation ACE inhibitors, what do they all say? These isomers can be separated using column chromatography, fractional crystallization. These are known methods. And the district court found that these were known methods. So, you know, here I don't think that they've done anything other than the obvious, and that's exactly why KSR is this court-defined evidence-maker. Let's see if he's got more time. Thank you.